# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**Trustees of the SOUTHWEST MULTI-
CRAFT HEALTH & WELFARE
TRUST FUND, et al.,**

Plaintiffs,

vs.                                                    No. 1:07-cv-0337 MCA/ACT

**IAP WORLD SERVICES, INC. and
KLEEN-TECH SERVICES
CORPORATION, et al.,**

Defendants.


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the *Motion of Defendants IAP World Services, Inc., Johnson Controls World Services, Inc., Johnson Controls Northern New Mexico, LLC, and IAP Northern New Mexico, LLC for Summary Judgment and Memorandum in Support* [Doc. 71], *Kleen-Tech Services Corporation's and Kleen-Tech Building Support Services, Inc.'s Joinder in Motion for Summary Judgment* [Doc. 73], and *Plaintiffs' Motion for Summary Judgment Against Defendants and Supporting Memorandum* [Doc. 72], all filed March 31, 2008. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court concludes that Defendants' Motion should be **GRANTED** and Plaintiff's Motion should be **GRANTED in part and DENIED in part.**

1

This is an action brought by the Plaintiffs under § 515 of ERISA, 29 U.S.C. 1145, to collect fringe benefit contributions allegedly owed by the Defendant employers.  The instant motions require the Court to interpret the terms of a collective bargaining agreement that define the Defendants' obligation to make fringe benefit contributions.  For the reasons set forth below, the Court concludes that Defendants are entitled to summary judgment with respect to all Counts of Plaintiff's *Second Amended Complaint for Delinquent Contributions under ERISA § 515, and for Injunctive Relief for Breach of Collective Bargaining Agreement* [Doc. 40] that are based on "hours paid" appendices (Counts I through V, a portion of Count VI, and Counts VII through XII).  Plaintiffs are entitled to summary judgment on the portion of Count VI that is based on an "hours worked" appendix.

## I.   BACKGROUND

The following facts are undisputed.  The Plaintiffs ("Funds") are collectively-bargained multi-employer welfare or pension benefit trust funds.[1]  Defendants ("Employers") are or were federal government service contractors or subcontractors who performed work at Los Alamos National Laboratory ("LANL").  There are two sets of defendants: (1) IAP World Services, Inc., acting on behalf of Johnson Controls World Services, Inc., Johnson

---

[1]They are:  (1) the Southwest Multi-Craft Health & Welfare Trust Fund, f/k/a the New Mexico & West Texas Multi-Craft Health & Welfare Trust Fund; (2) the New Mexico Laborers Training & Apprenticeship Trust Fund; (3) Laborers National Pension Trust Fund; (4) the New Mexico State Conference of Operative Plasterers & Cement Masons Trust Fund; (5) the New Mexico State Conference of Operative Plasterers & Cement Masons Apprenticeship Trust Fund; (6) the Operating Engineers Central Pension Trust Fund; (7) the Southwest Multi-Craft Health & Welfare Trust Fund on behalf of members of Operating Engineers Local 953 and the Former Operating Engineers Local 953 Health & Welfare Trust Fund; (8) the International Union of Painters and Allied Trades Local Union 823 Health & Welfare Trust Fund; (9) the New Mexico Finishing Trades Institute Trust Fund; (10) the Ironworkers Intermountain Health & Welfare Trust Fund; and (11) the Intermountain Ironworkers Pension Trust Fund.

Controls Northern New Mexico, LLC, and IAP Northern New Mexico, LLC (collectively, "JC/IAP"); and (2) Kleen-Tech Services Corporation and Kleen-Tech Building Support Services, Inc. (collectively, "Kleen-Tech").

Defendant Johnson Controls Northern New Mexico, LLC operated a service contract at LANL to provide utility system and infrastructure, custodial services, waste removal, maintenance of roads and grounds, construction support and engineering services from July 1997 until February 2003, when the contract was awarded to KSL Services Joint Venture ("KSL").  Kleen-Tech was a subcontractor and has operated at LANL from 1998 to the present.

In 2000, a written Collective Bargaining Agreement ("CBA") was executed which governs relations between JC/IAP and various unions with respect to work performed at LANL.  Kleen-Tech is bound by the 2000 CBA, as well as a subsequent CBA that took effect in 2005.  The CBA consists of a Master Labor Agreement and several appendices.  The appendices set forth the negotiated fringe benefit contribution rates the Employers agreed to remit for each union.

At issue here are:  Appendix C (Laborers), Appendix D (also Laborers), Appendix E (Painters), Appendix I (Plasterers and Cement Masons), Appendix J (Ironworkers), the Teamster Appendix, and the Operating Engineers Appendix.   Each Appendix requires the Employers to contribute to both health and welfare, and pension funds.  Appendices E and I also require contributions to apprenticeship funds.  The Appendices set forth the rates of contribution to each fund, and with one exception, require the Employers to contribute a

fixed dollar amount for every "hour paid" to employees.  The exception is contained in Appendix I, which requires fringe benefits to be contributed to the Apprenticeship Fund for each "hour worked" by employees.

The relevant "hours paid" language for each appendix is set forth below.[2]  Appendices C and D[3] state that Employers:

...will make payments on hours paid to employees covered by this Appendix....

[Doc. 71-5 at 2; 71-3 at 2–3.]

Appendix E[4] states:

For each hour or portion thereof, for which the employee received pay, the Company shall make contributions to the [Health and Welfare] fund in accordance with the contribution schedule....For the purpose of this Section, each hour paid for including hours attributable to show-up time and other hours for which pay is received by the employee in accordance with this Appendix, shall be counted as hours for which contributions are payable.

[Doc. 71-9 at 2.].  Regarding contributions to the Apprenticeship Fund, Appendix E states:

On hours paid to employees covered by the appendix, the Company will contribute...to...the...Apprenticeship Fund....

[Doc. 71-9 at 4.]

---

[2]The contribution rates will not be set forth in detail here.  Suffice to say that the Funds claim that JC/IAP is delinquent approximately $225,000 in unpaid fringe benefits, and is liable for an additional $443,000 in statutory interest and penalties, for a total of approximately $668,000.  They claim that Kleen-Tech is delinquent approximately $62,000, and liable for an additional $127,000 in statutory interest and penalties, for a total of approximately $189,000.

[3]Appendix C corresponds to Count XII of Plaintiffs' *Second Amended Complaint for Delinquent Contributions under ERISA § 515, and for Injunctive Relief for Breach of Collective Bargaining Agreement* ("Complaint") [Doc. 40].  Appendix D corresponds to Counts I and II of the Complaint.

[4]Appendix E corresponds to Counts VIII and IX of the Complaint.

4

Appendix I[5] states:

> The Company agrees to pay [the health and welfare fringe benefit fund] one dollar and twenty-two cents ($1.22) per hour for each hour paid to employee[s] covered by this Appendix[.]

[Doc. 71-7 at 2]

Appendix J[6] states:

> The Company agrees to contribute the specified amounts per hour for each hour paid to employees covered by this Appendix[.]

[Doc. 71-8 at 2.]

> The Operating Engineers Appendix[7] states, with respect to Pension benefits:

> The Company shall make contributions on hours paid to employees covered by this Appendix[.]

[Doc. 71-10 at 2–3.]   Regarding health and welfare benefits, the Operating Engineers

Appendix states:

> The Company shall make...payments per hour paid to employees covered by this Appendix[.]

[Doc. 71-10 at 3.]

Finally, the Teamster Appendix[8] states:

> The Company will make payments on hours paid to employees covered by this Appendix[.]

---

[5]Appendix I corresponds to Counts IV, V, and VI of the Complaint.

[6]Appendix J corresponds to Counts X and XII of the Complaint.

[7]The Operating Engineers Appendix corresponds to Count III of the Complaint.

[8]The Teamster Appendix corresponds to Count VII of the Complaint.

[Doc. 71-6 at 2.]

The relevant "hours worked" language from Appendix I states:

The Company will pay to the [Apprenticeship Fund] the [specified] amounts per hour for each hour worked by employees covered by this Appendix[.]

[Doc. 71-7 at 3.]

Beginning in 2003, the Funds conducted audits which they claim revealed that the Employers had been underpaying fringe benefits associated with overtime hours. They issued assessment letters to the Defendants, but Defendants refused to contribute the additional amounts Plaintiffs claimed were due. This action ensued.

The Funds filed their *Motion for Summary Judgment Against Defendants* on March 31, 2008. They seek summary judgment on both "hours paid" and "hours worked" fringe benefit contributions. The Funds argue that they are entitled to judgment as a matter of law because their audits determined that Defendants were delinquent and Defendants have failed to make the additional contributions requested. [Doc. 72.]

JC/IAP filed their motion for summary judgment the same day seeking summary judgment on the Funds' "hours paid" claims. They argue that the Funds' interpretation of the CBA is erroneous and that no additional "hours paid" fringe benefit contributions are owed. [Doc. 71.] The Kleen-Tech Defendants join in JC/IAP's motion. [Doc. 73.]

## II.   LEGAL STANDARDS

### A.   Summary Judgment

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed.R.Civ.P. 56(e). Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Id.

It is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all justifiable inferences in the non-moving party's favor. *Hunt v. Cromartie*, 526 U.S. 541, 551–52 (1999). Judgment is appropriate as a matter of law if the nonmoving party has failed to make an adequate showing on an essential element of his case, as to which he has the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

### B.    ERISA § 515

The Funds seek to collect allegedly delinquent contributions under section 515 of ERISA, which states:

**Delinquent Contributions**
Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall,

to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or agreement.

29 U.S.C. §1145. This section "creates a federal right of action independent of the contract on which the duty to contribute is based." *Bakery & Confectionary Union & Indus. Int'l Pension Fund. v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997) (citation and quotation marks omitted).

In a collection action based on section 515, multiemployer plans such as the Funds here "can enforce, as written, the contribution requirements found in the controlling documents." *Ralph's Grocery Co.*, 118 F.3d at 1021 (citation omitted). "Because an employer's obligation to a multiemployer plan usually arises through a collective bargaining agreement negotiated and agreed to by the employer and union, the multiemployer plan is, under common law contract principles, a third party beneficiary of the collective bargaining agreement." *Id.* (citation omitted). Section 515, however, "puts multiemployer plans in a stronger position than they otherwise would occupy under common law contract principles." *Id.* (citation omitted). "Before section 515 was enacted, collection actions by multiemployer plans often were complicated by issues that had arisen between the employer and the local union but were unrelated to the employer's obligation to the plan." *Id.* (citations omitted). "Injecting these tangential issues into collection actions consumed plan resources by increasing the cost and delay involved in litigation." *Id.* (citations omitted).

As a result of these concerns, employers' defenses to a collection action are limited:

Section 515 strengthens the position of multiemployer plans by holding employers and unions to the literal terms of their written commitments. Because an employer's

8

obligation to a multiemployer fund is determined by the plain meaning of the language used in the collective bargaining agreement, the actual intent of the contracting parties (i.e., the employer and the local union) is immaterial when the meaning of that language is clear. Consequently, an employer is not permitted to raise defenses that attempt to show that the union and employer agreed to terms different from those set forth in the agreement. Nor is an employer permitted to raise defenses that relate to claims the employer may have had against the union. By allowing multiemployer funds to enforce the literal terms of an employer's commitment, section 515 increases the reliability of their income streams, reduces the cost and delay associated with collection actions, and reduces or eliminates the cost of monitoring the formation of collective bargaining agreements. Nevertheless, multiemployer funds are not permitted to enforce a nonexistent contractual obligation.

*Ralph's Grocery Co.*, 118 F.3d at 1021–22 (citations omitted and quotation marks omitted);

*see also Trs. of Colo. Tile, Marble & Terrazzo Workers Pension Fund v. Wilkinson & Co.*,

Nos. 96-1431, 96-1205, 1998 WL 43172, at *5 (10th Cir. Feb. 3, 1998) ("Though this circuit

has not yet had cause to interpret and apply § 515, we agree with all of the circuits who have,

that it makes it easier for multiemployer plans to collect delinquent contributions and limits

the defenses available to employers.")

## C.      Collective Bargaining Agreements and Applicable Standards

The collective bargaining agreement, which establishes the employer's obligation, is

central to a section 515 claim. *See Cent. States, Se. & Sw. Areas Pension Fund. v. Kroger

Co.*, 73 F.3d 727, 730–31 (7th Cir. 1996). "According to section 515, the literal terms of the

agreement control the employer's obligation to the Fund. The actual intent of the contracting

parties is immaterial when it differs from the ordinary meaning of the language used in the

writing." *Ralph's Grocery Co.*, 118 F.3d at 1018.

Generally, the intention of the parties to an unambiguous collective bargaining agreement must be gleaned from its four corners. *Manning v. Wiscombe*, 498 F.2d 1311, 1313 (10th Cir. 1974). Traditional rules of contract construction apply to collective bargaining agreements to the extent the rules do not conflict with federal labor law. *Ralph's Grocery Co.*, 118 F.3d at 1025; *see also Kroger Co.*, 73 F.3d at 731 (federal commonlaw rules of contract interpretation apply in section 515 action).

The general rule is that if a collective bargaining agreement is unambiguous, the court may declare its meaning as a matter of law, without resort to extrinsic evidence of intent. *See Palace Exploration Co. v. Petroleum Dev. Co.*, 374 F.3d 951, 953 (10th Cir. 2004) (contract that is free of ambiguity is to be interpreted by the court as a matter of law); *Volkman v. United Transp. Union*, 73 F.3d 1047, 1050 (10th Cir. 1996) (holding that if collective bargaining agreement is unambiguous, it may be construed as a matter of law without resort to extrinsic evidence of intent); *Kroger Co.*, 73 F.3d at 732. On the other hand, "[i]f it is unclear, then questions of interpretation must be resolved by the trier of fact" and summary judgment is not appropriate. *Kroger Co.*, 73 F.3d at 732 (citation omitted); *see also Chiles v. Ceridian Corp.*, 953 F.3d 1505, 1515 (10th Cir. 1996) (holding that summary judgment is not appropriate when conflicting evidence must be evaluated to illuminate ERISA plan's terms).

The mere fact that the parties disagree or press for differing constructions does not render a contract ambiguous. *Otis Elevator Co. v. Midland Red Oak Realty Co.*, 483 F.3d 1095, 1102 (10th Cir. 2007). A provision of a contract is ambiguous only if it is susceptible

to more than one reasonable interpretation. *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007) (citation omitted). "Whether a contract is ambiguous so as to require extrinsic evidence to clarify the doubt is a question of law for the courts." *Palace Exploration Co.*, 374 F.3d at 953 (citation and quotation marks omitted). In the absence of ambiguity, "the intention of the parties must be ascertained from the language used in the written contract, without resort to parol evidence or extrinsic circumstances." *Local 9, Int'l Union of Operating Eng'rs, AFL-CIO v. Siegrist Constr. Co.*, 458 F.2d 1313, 1316 (10th Cir. 1972)(collecting cases).

Notwithstanding these general rules, extrinsic evidence may sometimes be considered if offered to show that an ambiguity exists in a contract that appears unambiguous on its face.[9] *Mesa Oil, Inc. v. Ins. Co. of N. Am.*, 123 F.3d 1333, 1340–41 (10th Cir. 1997); *see also Bock v. Computer Assocs. Int'l, Inc.*, 257 F.3d 700, 708 (7th Cir. 2001) (holding that "strong extrinsic evidence indicating an intent contrary to the plain meaning of the agreement's terms can create an ambiguity—provided that the evidence is objective"). Extrinsic evidence is admissible to ascertain the meaning of ambiguous terms, but the matter is then typically rendered a question of fact that is not appropriate for summary judgment.

---

[9]The type of ambiguity that justifies resort to extrinsic evidence is demonstrated by the classic contract case *Raffles v. Wichelhaus*, (1864) 159 Eng. Rep. 375. *Raffles* concerned a contract for the shipment of a specified amount of cotton from one port to another on the ship *Peerless*. The contract appeared clear on its face, until it was revealed that there were two or more ships named *Peerless*. It was impossible to tell which one the contract referred to, thus extrinsic evidence was necessary to demonstrate that an ambiguity existed and to aid in the resolution. *AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572, 575 (7th Cir. 1995). Absent a "latent" ambiguity, such as the one illustrated by the *Peerless* case, extrinsic evidence should not be used to alter the meaning of a contract that is clear. *See Orth v. Wis. State Employees Union Council 24*, 500 F.Supp.2d 1130, 1136 (E.D. Wis. 2007).

*See El Paso Natural Gas Co. v. W. Bldg. Assocs.*, 675 F.2d 1135, 1141 (10th Cir. 1982).

Mindful of these standards, the Court now addresses the parties' claims.

## III.   ANALYSIS

### A.   Fringe Benefits for "Hours Paid"

#### 1.   The Parties' Positions

The Funds and the Employers disagree over the term "hours paid."  Whereas the Funds argue that the CBA requires fringe benefits to be paid at a higher rate for overtime hours than they are paid for "straight time" hours, the Employers assert fringe benefits are contributed at the same rate regardless whether the contribution is for "straight time" hours, vacation, holiday or sick leave, or for overtime hours.

The Funds assert that because overtime wages are paid at either one and one-half or two times the normal hourly rate, the term "hours paid" requires Employers to make a corresponding increase in the fringe contribution benefit rate for overtime hours paid to employees.  The Funds' argument essentially is that the overtime multiplier (1.5 or 2.0) applies to the fringe benefit contribution as well as the wage rate for overtime.

The Funds start from the undisputed proposition that the Employers are required to pay overtime wages at either one and one-half or double the regular hourly wage.[10]  Where the Funds differ from the Employers is in the conclusion that fringe benefit contributions should be made "on the basis of one and one-half hours for each overtime hour and double

_____

[10]What constitutes "overtime" and whether time and one-half or double time applies are determined by federal law and the CBA.  These definitions are not at issue here.

time for each double time hour worked." [Doc. 104 at 6.] The Funds argue that the term "hours paid" means "all hours paid, whether worked or not, inclusive of hours actually worked such as the basic hour of overtime worked, inclusive of unworked but paid hours such as vacation, holiday or sick leave hours, *inclusive of the premium portion of overtime (the additional one-half or full hour paid for overtime)*." [Doc. 87 at 7 (emphasis added).] As suggested by the italicized clause, the Funds' position essentially is that overtime pay consists of an extra half (or full) hour that is paid but not worked by the employee, similar to vacation or holiday hours that are paid but not worked. Their proposed definition for the term is:

> Hours paid means for every straight time hour worked, fringe benefit contributions are paid at one hour, for every time and one-half hour worked, fringe benefit contributions are paid at one and one-half hours, and for every double time hour worked, fringe benefit contributions are paid at double time.

[Doc.40, ¶ 40 (Second Amended Complaint).]

The Employers agree with the Funds that "hours paid" includes unworked but paid hours such as vacation, holiday, and sick time. They do not agree, however that the CBA requires any adjustment of the fringe benefit contribution rate for overtime hours. The Employers contend that overtime is not pay for unworked hours, but rather pay at higher rate for hours that are actually worked.

### 2.    The Plain Meaning of "Hours Paid"

The Court has reviewed the CBA and considered the competing constructions offered by the parties. The Court concludes that the CBA is unambiguous and the Court rejects the

13

Funds' interpretation because it is not the plain of literal meaning of the term "hours paid."

The Funds' construction is based on the premise that when an employee receives overtime pay "[i]n reality, it is the hours that are adjusted upwards...not the rate." [Doc. 87 at 5.] Thus, according to the Funds, an employee that works one hour of overtime actually receives pay for one and one-half hours (or two hours, in the case of double time). This premise is faulty. As explained in more detail below, an employee that works one hour of overtime is paid for only one hour. Though the rate of pay for overtime hours is higher than "straight time" hours, the employee still only worked—and was only paid for—one hour. Thus, for purposes of fringe benefit contributions under the CBA at issue, one hour of overtime is only one "hour paid."

The Funds' contention that an employee who works one hour of overtime or one hour of double time is actually being paid for one-and-a-half or two hours, as the case may be, has no basis in the language of the CBA. Under the CBA, overtime is a rate of pay that is higher than the "straight time" rate of pay. The Master Labor Agreement, which is the governing document, defines overtime by reference to the standard Monday through Friday workweek. [Doc. 73-5 at 2.] All "hours worked" before or after the established workday and all "hours worked" on weekends are paid at the "applicable overtime rate." [Id.] The "overtime rate" is also paid for multiple shifts, in certain circumstances. [Id.] The Operating Engineers Appendix also indicates that the overtime rate is computed by applying a multiplier to the straight time rate: "[Work specified in the Appendix] shall constitute overtime to be paid at the rate of time and one-half (1-1/2) the applicable straight time rate[.]" [Doc. 71-10 at 3

(emphasis added).]  These excerpts belie the Funds' claim that there is only "one rate" applicable to all hours.  [Doc. 88 at 9.]  Under the CBA, rates of pay change depending on whether the hour is "straight" time or overtime.  When an employee works overtime, it is the rate that is adjusted, not the hours.

The Funds' interpretation is also contrary to federal labor law, which recognizes overtime as a higher rate of pay, generally for hours worked in excess of forty per week. Though the Funds characterize this as "illogical" and "rate manipulation," it is what federal law requires.  Overtime pay, as the concept is understood in federal labor law, reflects the policy that employees be compensated by a higher rate of pay for the burden of hours worked in excess of the standard 40-hour workweek.  The Fair Labor Standards Act ("FLSA") states: "No employer shall employ any of his employees [for a workweek longer than forty hours] unless such employee receives compensation for his employment in excess of the [forty] hours...*at a rate not less than one and one-half times the regular rate at which he is employed.*"  29 U.S.C. § 207(a)(2) (emphasis added).  Overtime compensation is achieved by adding a 50% premium to the employee's regular rate, not by artificially adjusting the hours.  Thus, under the FLSA, overtime is a rate that is computed by applying a 1.5 multiplier to the regular rate—not by applying the multiplier to the excess hours.

The Funds' claim that an employee who receives overtime is being paid for hours that he did not work is untenable and contrary to federal labor law.  Their argument is that the premium portion of an hour of overtime pay at "time and a half" includes an extra half hour that is paid, but not worked, similar to a vacation or holiday hour that is paid, but not worked.

15

However, it is clear under federal labor law that overtime is premium pay for hours *actually* worked.  As stated by the United States Supreme Court, the FLSA embodies a "statutory policy of requiring the employer to pay one and one-half times the regular hourly rate for all hours actually worked in excess of 40."  *Walling v. Helmerich & Payne, Inc*., 323 U.S. 37, 42 (1944); *see also Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S.419, 423–24 (1945) ("[B]y increasing the employer's labor costs by 50% at the end of the 40-hour week and by giving the employees a 50% premium for all excess hours, [the FLSA] achieves its dual purpose of inducing the employer to reduce the hours of work and to employ more men and of compensating the employees for the burden of a long workweek.").

Similarly, the Tenth Circuit holds that the overtime pay requirement under federal labor law reflects "the simple statutory command that an employee who works more than 40 hours per week shall be paid for such additional hours at a rate which is at least one and one-half times his regular rate of pay."  *Donovan v. McKissick Prods. Co.*, 719 F.2d 350, 352 (10th Cir. 1983) (emphasis added).  Thus, overtime is not, as the Funds claim, pay for unworked hours, analogous to vacation and holiday hours.  Rather, it is a higher rate of compensation for hours actually worked.

The Court finds nothing in the case law to support the Funds' interpretation of the term "hours paid."  And the Court is unaware of any authority addressing the precise issue raised here, *i.e.*, whether the term "hours paid" obligates the employer to contribute a premium for fringe benefits on overtime hours.  To the extent that any guidance can be gleaned from the case law, it is that if the parties intended for an overtime multiplier to apply

to fringe benefit contributions, it is expressly so provided in the contract.  *See, e.g.*, *Laborers'*
*Local Union No. 91 Welfare Fund v. Danco Constr., Inc.*, No. 94-CV-0318E(M), 1996 WL
189510, *1 n.8 (W.D.N.Y. Apr. 17, 1996) ("The cba also provides that [the fringe benefit
contribution rates will be adjusted by the same multiplying factors which apply to
overtime."); *Carpenters Dist. Council of Buffalo & Vicinity v. Rausch-Alan, Inc.*, No. 93-CV-
0102E(F), 1994 WL 394988, *1 (W.D.N.Y. July 19, 1994) ("Contribution rates for overtime
hours were to be paid at either one-and-a-half times or twice the respective [straight-time
contribution] rates, as appropriate.").  In contrast, the CBA at issue here does not distinguish
between fringe benefit contributions for overtime hours and fringe benefit contributions for
"straight-time" hours.

The Funds nevertheless assert that "for trust fund accounting" purposes, when an
employee works overtime, the rate of pay remains the same and it is the hours that are
adjusted.  As explained by the certified public accountant that performed the audits for the
Funds, when reporting monthly fringe benefit contributions, employers submit a form on
which the fringe benefit rate is preset at the rate specified in the CBA and does not change.
[Doc. 87 at 4 (quoting deposition of Ken Kerulis).]  The hours, however, fluctuate from
month to month.  [Id.]  To achieve the result advocated by the Funds, overtime hours
reported on the form must be "adjusted" upward.  From this, the Funds conclude that the
Defendants are delinquent because they did not adjust the hours upward to account for
overtime hours worked.

I do not find this argument persuasive.  First, it assumes that the audits reflect a

17

correct interpretation of the CBA.  In fact, Mr. Kerulis appears to acknowledge that he is opining, not from a legal perspective, but from an accountant's point of view:

> Q:   So, did you have an occasion to make a determination that the defendants properly—that the defendants paid fringe benefits properly on a straight-time basis.
>
> ***
>
> A:   I don't know if it was proper.  I can tell you how it was computed.  But whether it is proper or not is not my determination.  That has to go to the collective bargaining agreement.  We don't make determinations as to whether something is proper.

[Doc. 87-2 at 3.]

Second, the accounting method used to compute overtime does not control over the plain meaning of the CBA.  There is no doubt that multiplying the hours by 1.5 (or 2.0) achieves the same mathematical result as applying the multiplier to the rate of pay.  Thus, adjusting the hours upward may be a legitimate method, from an accounting point of view, for computing the compensation that is due for overtime.  However, merely because an employee receives the equivalent of one and one-half (or two) hours of regular pay for one overtime hour does not mean that he has been paid for one and one-half (or two hours).  Rather, he has been paid for one hour at a higher rate.  As explained above, this is the meaning of "overtime" under federal law, and it is mandatory.  The parties are not free to redefine the term in the CBA.

The Court concludes that the CBA is unambiguous.  There is only one reasonable interpretation of the term "hours paid."  The term "hours paid" in the context of this CBA

requires Defendants to make the specified fringe benefit contribution for every hour for which an employee is paid, regardless whether the hour was worked, not worked, or an hour for which the employee received overtime pay. The Court rejects the Funds' interpretation because it is not the plain or literal meaning of the term "hours paid." In sum, since overtime is a rate of pay for hours actually worked, where overtime is concerned, "hours worked" is the same as "hours paid." In other words, under the "hours paid" contract at issue here, there is no difference for fringe benefit purposes, between an hour of overtime and an hour of regular pay.[11]

### B.    Extrinsic Evidence Submitted by the Parties

The Court has found that the CBA is clear and unambiguous, and has interpreted the term "hours paid" based on the language used in the actual writing, as informed by federal law, without resorting to extrinsic evidence. *See Palace Exploration Co.*, 374 F.3d at 953 (stating that when contract is unambiguous, the only legitimate evidence of what the parties intended is the language of the contract itself). Thus, this is "not a situation in which the collective bargaining agreement is ambiguous, in which case consideration of extrinsic evidence might be appropriate in construction of the agreement." *See Trs. of Colo. Tile, Marble & Terrazzo Workers Pension Fund v. Wilkinson & Co.*, Nos. 96-1431, 96-1205, 1998 WL 43172, at *5 (10th Cir. Feb. 3, 1998).

---

[11]This does not, as the Funds suggest, eliminate the distinction between "hours worked" contracts and "hours paid" contracts in general. The two types of contracts are distinguished by whether fringe benefits are contributed for hours that an employee receives pay, but does not work, such as vacation and holiday hours. The Court's construction of "hours paid" does not eliminate that difference.

In their briefs, the parties argue that the CBA is unambiguous.  Nevertheless they have submitted extrinsic evidence as to its meaning.  The Court has reviewed the evidence submitted by the parties and concludes that the proffered evidence does not demonstrate ambiguity in the CBA and does not override its plain meaning.  The evidence falls generally into three categories: (1) evidence of the intent or understanding of the parties as to the meaning of the term "hours paid"; (2) evidence of past and current practice of Defendant JC/IAP and others; and (3) evidence of trade usage.  Though the Court did not rely on this evidence in determining the meaning of the term "hours paid," for purposes of completeness, the evidence submitted by the parties is reviewed below.

### 1.        Evidence of the intent or understanding of the parties

Both sides offer evidence as to their understanding of the term "hours paid." Defendants offer, for example, the affidavit of IAP's Human Resources Director, Mark Gow [Doc. 71-2 at 4–5] and the deposition testimony of KSL's Manager of Labor and Employee Relations Programs Martin Dominguez [Doc. 71-11 at 2].  The Funds rely primarily on the deposition testimony and affidavit of their CPA, Ken Kerulis [Docs. 72-13, 87-2, 87-5], and to some extent on the deposition testimony of management Trustee E.B. Watson [Doc. 87-3] and Fidel Munoz [Doc. 87-4].  Since the parties contend that the CBA is unambiguous, this evidence presumably is not offered for the purpose of demonstrating that an ambiguity exists, but rather to explain its meaning.

The testimony and affidavits of these witnesses are not proper evidence for the Court's consideration where, as here, the issue presented is solely a question of law on a

matter of contract interpretation.  These witnesses are merely offering their understanding of how fringe benefits should paid.  Interpreting an unambiguous contract, however, is the Court's function.  When the contract is unambiguous, the only legitimate evidence of what the parties intended is the language of the contract itself.  *Palace Exploration Co.*, 374 F.3d at 953.

### 2.    Evidence of past and current practice

The Funds submit evidence they claim shows that JC/IAP, as well as both its predecessor and successor contractors under the CBA, have "consistently correctly calculated fringe benefit contributions by adjusting the hours paid to employees."  [Doc. 87 at 5.]  By "correctly," the Funds mean that fringe benefits were paid in the manner that the Funds believe is correct.[12]  The evidence consists of the affidavit of Mr. Kerulis in which he lists 23 monthly Employer Reporting Forms ("ERFs") that show an "adjustment to 'hours paid' for overtime work such that payment at time and one-half or double time for overtime work resulted in a fringe benefit being contributed at time and one-half or double time."  [Doc. 87-5 at 1.]  Five of the forms are attached to the affidavit.  [Docs. 87-6 through 87-10.]

It appears to be the Funds' position that JC/IAP's past practices demonstrate that it adhered at times to an interpretation of the term "hours paid" that is consistent with the Funds' interpretation.  However, as explained above, JC/IAP's intent or understanding of the term "hours paid" is not relevant, where, as here, the contract is unambiguous.  That

---

[12]Kleen-Tech, apparently, has never paid fringe benefits "correctly" according to the Funds, and in fact currently persists in failing to adjust hours upward when determining the amount of fringe benefit contributions due for overtime.

Defendants or other contractors may have at times paid more than what was required does not change the plain meaning of the CBA.  As the Funds themselves repeatedly assert, "[b]ecause an employer's obligation to a multiemployer fund is determined by the plain meaning of the language used in the collective bargaining agreement, the actual intent of the contracting parties...is immaterial when the meaning of that language is clear." *Ralph's Grocery Co.*, 118 F.3d at 1021.

The Funds do not argue that JC/IAP's prior practice established a course of dealing. But even if the Funds were to so argue, a course of dealing cannot be used to contradict an unambiguous contract term or override its plain meaning. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1211 (10th Cir. 2007) (citing Richard A. Lord, Williston on Contracts § 34:7 (4th ed. 1990)).

Examination of the ERFs and Mr. Kerulis' affidavit leads the Court to further question the relevance of this evidence.  Though the Funds claim that JC/IAP "consistently" paid "correctly," of the 23 ERF examples listed by Mr. Kerulis, only 16 ERFs relate to IAP/Johnson Controls.  The other seven examples are ERFs submitted by Pan Am World Services, Inc., JC/IAP's predecessor, or KSL, its successor, neither of which is a party to this case.  The Funds have not explained how the conduct of these nonparties is relevant or binding on JC/IAP.  Moreover, all but one of the ERFs were submitted prior to 2000 and thus do not relate to the CBA at issue here.  In short, evidence that JC/IAP sometimes paid fringe benefits using a method that it now disclaims, is not material to the issues presented.  At most, this evidence shows that the persons preparing the forms on behalf of JC/IAP may have

been unclear about what the CBA required with regard to payment of fringe benefits.

For the reasons stated above, the Court concludes that evidence of the past fringe benefit contribution practices of JC/IAP and others is not relevant, does not demonstrate ambiguity in the CBA, and does not override its plain meaning.

### 3.    Evidence of trade usage

According to the Funds, their interpretation is the "long-standing definition of 'hours paid' in New Mexico in labor agreements between contractors and unions" [Doc. 87 at 8], and that "in this community for more than two decades contractors and unions alike have uniformly defined 'hours paid' [as the Funds define it]" [Doc. 88 at 7]. As evidence of how the term "hours paid" is used in New Mexico, the Funds submit portions of two labor agreements: one between the New Mexico Building Branch, Associated General Contractors ("AGC") and the New Mexico and Western Texas Laborer's District Council, Local No. 15, in effect from April 1984 to March 1987 [Doc. 87-15], and one between AGC and the Teamsters Local Union No. 492, negotiated in 2005 [Doc. 87-12]. Both contracts contain the following express definition of "hours paid" that the Funds urge the Court to adopt for the CBA under consideration here:

> Basis of Payment of Fringe Benefit Contributions: Contractor contributions...shall be paid on the basis of hours paid for (i.e., each straight time hour shall be counted as one (1) hour, each time and one-half hour as one and one-half hour, each double time hour as two (2) hours...

[Doc. 87-12 at 3; doc. 87-15 at 3.] They also submit a letter from AGC's Director of Industry Relations and Safety which states, in part:

For purposes of our current agreements with carpenters, laborers, cement masons, operating engineers, and ironworkers, we have defined the term "hours worked" as meaning "each straight time hour shall be counted as one hour, each time and one-half hour as one hour, and each double time hour as one hour." This is in contrast to "hours paid", which in our interpretation means the following: Each straight time hour shall be counted as one hour of fringe benefit payments, each time and one-half hour and [sic] one and one-half hours fringe benefit payment, and each double time hour double time fringe benefit payment." The respective clauses in current AGC-negotiated agreements contain a reference to "hours worked" with a parenthetical explanation (same as definition stated [above]), in order to reduce the possibility of confusion as to the intent of the bargaining parties with respect to basis of payment of fringe benefits required under terms of those agreements.

[Doc. 87-3 at 7.] Finally, the Funds refer to the deposition testimony of E.B. Watson who states:

The hours worked and hours paid, for as long as I've been in the industry, is common knowledge of what it means. I mean, I don't know of any union member or any contractors that don't understand the meaning of those terms.

[Doc. 87-3 at 4.]

Evidence of trade usage of a disputed contract term can be used to "illuminate the context for the parties' contract negotiations and agreements" and may be considered by the Court for the purpose of determining whether an ambiguity exists. *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999) (reconciling two divergent lines of cases on the role of trade practice and custom in contract interpretation). This does not mean, however, "that a court should always accept evidence of trade practice and custom in interpreting the terms of a contract." *Metric Constructors, Inc.*, 169 F.3d at 752. "Instead, a court should accept evidence of trade practice only where a party makes a showing that it relied reasonably on a competing interpretation of the words when it entered the contract." *Metric*

*Constructors, Inc.*, 169 F.3d at 752.

Here, the Funds have made no showing that either they or the unions that negotiated the CBA relied on the supposed customary interpretation of the term "hours paid."  To the contrary, the Funds repeatedly assert throughout their briefs that the circumstances of the contract negotiations and the intentions of the parties to the CBA are immaterial.  Without some indication that either they or the unions relied upon a universally or commonly understood meaning for "hours paid," the evidence of trade usage shows only that "some practitioners customarily accomplish tasks differently from the manner called for by the clear language of the contract."  *See Metric Constructors, Inc.*, 169 F.3d at 752.

Trade usage also requires a showing of "regularity of observance and expectation of use within the industry."  *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1285 n.15.  The two AGC labor agreements alone do not meet this standard.  Without a showing that the definitions they contain are regularly observed, the two contracts are simply isolated examples of how the term "hours paid" is used.  Furthermore, the letter from AGC's representative does not purport to describe industry practice in general.  It states only that AGC's practice is to include express definitions of the two terms in the agreements that it negotiates.

Finally, to prove trade usage, a party usually must call an expert.  *Avedon Eng'g, Inc.*, 126 F.3d at 1285 n.15.  Attestations by a party's agents or employees are insufficient.  *Avedon Eng'g, Inc.*, 126 F.3d at 1285 n.15.  To establish trade usage, more is required than "a vague, unspecific reference."  *Avedon Eng'g, Inc.*, 126 F.3d at 1285 n.15.  The Funds'

evidence fails to meet these standards.  Mr. Watson has not been established as an expert on any topic relating to this litigation.  Furthermore, his statement that the meaning of "hours paid" is "common knowledge" is vague and unspecific, and without any articulated foundation. His attestations, therefore, cannot qualify as probative on the issue of the trade usage of the term "hours paid."

The Court thus concludes that the Funds' evidence regarding the use of the term "hours paid" in labor agreements other than the one at issue here, as well as the testimony of Mr. Watson, is neither relevant, nor probative.

### C.      Fringe Benefits for "Hours Worked"

A portion of Count VI, against JC/IAP, is based on an "hours worked" provision of Appendix I.  The Funds have submitted the affidavit of Mr. Kerulis which asserts that JC/IAP underreported the hours worked and is delinquent in its contributions to the Apprenticeship Fund for Plasterers and Cement Masons.

JC/IAP does not dispute this claim, and has failed to address the hours worked provision of Appendix I in any of the briefs it submitted.  The Court accordingly concludes that the Funds have met their summary judgment burden with respect to the "hours worked" portion of Count VI, and are entitled to summary judgment in that respect.

## IV.    CONCLUSION

The Court concludes that Defendants' motion is well-taken and should be **GRANTED**. Plaintiffs' motion is well-taken with respect to the "hours worked" portion of Count VI, and should be **GRANTED** regarding that portion only.

**IT IS, THEREFORE, ORDERED** that the *Motion of Defendants IAP World Services, Inc., Johnson Controls World Services, Inc., Johnson Controls Northern New Mexico, LLC, and IAP Northern New Mexico, LLC for Summary Judgment and Memorandum in Support* [Doc. 71], *Kleen-Tech Services Corporation's and Kleen-Tech Building Support Services, Inc.'s Joinder in Motion for Summary Judgment* [Doc. 73] are **GRANTED.** *Plaintiffs' Motion for Summary Judgment Against Defendants and Supporting Memorandum* [Doc. 72] is **GRANTED in part and DENIED in part** as set forth herein.

SO ORDERED this 28th day of August 2008, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

27